EDWARD H. WARD, JR., et al., executors of Hannah D. Hopper, deceased,

*v.*

STEPHEN L. TALLMAN et al.

[Filed June 11th, 1903.]

1. Where a bill to quiet title to realty, under act of March 2d, 1870 (*Gen. Stat. p. 3486*), omits a statutory allegation, but complainant's peaceable possession with claim of ownership is admitted, and there is no misunderstanding as to the issues, an amendment may be made to bring the cause within the statute.

Ward *v.* Tallman.

2. In a statutory action to quiet title, under act of March 2d, 1870 (*Gen. Stat. p. 3486*), the complainants, being in peaceable possession of the premises, are not required to establish their title until the defendant has shown *prima facie* the adverse title or interest which he claims.

3. In a suit by complainants in peaceable possession of premises to quiet title, defendant's adverse title under an alleged heir of complainants' intestate, who died seized of the premises, is not sustained by proof that such heir called intestate "cousin," with inferences drawn from such fact by persons who had no knowledge in regard to the matter, where it appears that such heir and defendant, with full knowledge of the fact for a period of forty years, failed to assert any claim based on relationship to intestate.

*Mr. James Sleen,* for the complainants.

*Mr. Frederick W. Hope,* for the defendants.

STEVENSON, V. C.

The suit is under the act of March 2d, 1870 (*Gen. Stat. p. 3486*), to quiet the complainants' title to a house and lot in Eatontown, Monmouth county, of which one George E. Tiffin died seized in 1857. Tiffin died intestate and the premises in question constituted his "mansion-house." The widow of Tiffin, whose name after her second marriage was Hannah D. Hopper, remained in possession of the premises continuously after Tiffin's death for forty-two years, until her own death, in 1899.

The complainants, the executors of Hannah D. Hopper, succeeded to her possession as the representatives of her estate and of her general devisees. The defendants claim title through their ancestor, Mrs. Abigail Tallman, who they insist was heir-at-law of George E. Tiffin.

1. The course of pleading has been very irregular. Before the trial, however, the complainants' bill was entirely recast and an amended answer thereto was filed. The cause has been prosecuted upon these amended pleadings strictly as a suit to quiet title under the statute, and any further amendments which have been suggested, and which have been considered made, may be actually made on the record before settlement of the decree

in order that the issues which the parties have litigated and have deemed as presented by the pleadings may appear therein.

In a supplementary brief submitted on behalf of the defendants, the objection is taken that the devisees for whom the complainants, as executors, have acted, are not parties to the suit. The understanding was reached at the commencement of the case that these parties could be joined as complainants.

The same brief takes the point that the evidence does not show that the complainants were in possession of the land in question.

The answer to the amended bill alleges that the complainants, as executors,

"being entitled to take charge of the personal estate of said Hannah D. Hopper at the time of her decease, and thereafter, entered into and upon the house and lot in question for the purpose"

of affecting a sale of the personal property there located, and that the complainants entered "for that purpose and not by reason of any right, title and interest which the said Hannah D. Hopper had in said real estate." The answer then goes on to allege that the

"complainants having entered upon the real estate and in the dwelling-house for the purpose aforesaid, wrongfully assumed custody and control of the property, and have since claimed to be in possession thereof, and have permitted some party for them to occupy the property, and attempted to exercise acts of control and possession over it, but these defendants expressly deny that they have any title thereto," &c., and "show that their continuing to do so or placing someone in charge of said property, or retaining the custody and occupancy of said premises, excepting for the purpose of removing therefrom the personal property of said Hannah D. Hopper, is wrongful and illegal."

The answer further alleges that the complainants, as executors of Hannah D. Hopper, deceased,

"or some of the parties interested in her estate as legatees, wrongfully and illegally and fraudulently continued to occupy and use the house and lot in question in this cause after the death of the said Hannah D. Hopper, and that the aforesaid executors or their counsel claimed, in answer to inquiries and requests, made on behalf of these defendants,

Ward v. Tallman.

to vacate said house and lot, and permit these defendants to use and enjoy the premises as they were entitled to, that Hannah D. Hopper had some rights, and that the executors could not give up the property to these defendants without an order of the court or the consent of the parties interested."

The answer concludes with a prayer . or demand that "the complainants be compelled to vacate and surrender said premises to these defendants."

Throughout the whole trial no evidence was offered to controvert the claim that the complainants were in peaceable possession, and that they were in such possession with claim of ownership, was admitted throughout the oral argument. A reference to the bill, however, shows that it is singularly defective in respect of the necessary allegations to bring the case within our statute. *Southmayd* v. *City of Elizabeth, 2 Stew. Eq. 203.* One of the statutory allegations which appears in the original bill seems to have been dropped out of the amended bill.

There has, however, been no misunderstanding as to the issue which has actually been tried and argued in this cause. Under the circumstances, the bill may be amended by the addition of the necessary few lines in order to bring the case within the scope of the statute.

2. The complainants being in peaceable possession of the land in question, claiming to own the same, have a right to have their possessory title, whether it be good or bad, quieted as against all of the defendants who cannot show a better title. Every answering defendant in a suit under our statute stands in the position of a plaintiff in ejectment. The general intention of our statute is to enable the party in peaceable possession of land, claiming to own the same, to compel all persons asserting claims of any kind at law or in equity hostile to such possession, to elect either to abandon those claims or undertake, affirmatively, to establish them. The statute gives no jurisdiction where any suit shall be pending to enforce or test the validity of the outstanding title or interest which is asserted adversely to the party in peaceable possession. The decisions of our courts indicate a further limitation of the jurisdiction to those cases where an adequate remedy cannot be had at law.

---

Ward *v.* Tallman.

---

*Jersey City* v. *Lembeck, 4 Stew. Eq. 255, 272, 273; Sheppard* v.
*Nixon, 16 Stew. Eq. 627, 633.*

Our statute appears to have been designed, primarily, to
afford a remedy against an inequitable situation. A person in
peaceable possession of land, claiming to own the same, whose
rights and advantages of ownership are impaired by an outstand-
ing hostile claim of title, needs no protection under our statute,
either in the case expressly excluded from the operation of the
act, where an action is pending in which the adverse title can
be tested, or in case he can bring an action at law in which such
test can be made. The hardship arises when he cannot either
bring an action at law or avail himself of any pending action at
law to test the validity of the hostile title, while the holder of
that title also refuses to institute any test suit and at the same
time injures the title of the party in possession by the assertion
of his hostile claim. In this situation of affairs our statute
seems to be intended to permit the party peaceably enjoying
possession of the land to compel the party holding an adverse
title and refusing to test it in an action at law or suit in equity
to choose between abandoning his title or asserting it, and thus
putting it to a test through the proceeding in equity or at law
which the statute provides for that purpose.

It would seem, therefore, from the very nature of this statu-
tory action, that where the party in possession has the right to
employ it in order to quiet his title, he is not obliged to dis-
close his own title, much less to defend it, until some defendant
has come forward and established at least *prima facie* the ad-
verse title or interest which he claims.

In this view of the case it is immaterial whether the com-
plainants, or any of them, derived any title under the will of
Mrs. Hannah D. Hopper, or whether Mrs. Hopper ever ac-
quired, by adverse possession or otherwise, any interest in the
premises beyond her interest as dowress or as widow occupying
under her right of quarantine, until the defendants, or some of
them, establish *prima facie* that they hold title as the heirs-at-
law of George E. Tiffin, or some person who took title under
George E. Tiffin by descent or purchase.

The question, therefore, to be settled first is not whether the

Ward *v.* Tallman.

complainants, or any of them, have title by adverse possession or otherwise, but whether these answering defendants, or any of them, have established *prima facie* any title in themselves. If they have, then the complainants must disclose their title and show it to be a better title than that of the defendants; if they have not, it would seem that the complainants need make no disclosure of their title. Their peaceable possessory title, although of unknown origin, is entitled to protection under the statute against a defendant who asserts an adverse title which he fails to support by proof.

3. The whole claim of title of these defendants is based upon the proposition that their ancestor, Abigail Tallman, was the heir-at-law of one George E. Tiffin, who, as is admitted by both parties, died intestate seized of the premises in question, in 1857. This George E. Tiffin left a widow, Hannah D., in possession of the premises, who subsequently, in 1867, remarried with one John Hopper, and after such marriage continued to occupy the premises until her death. John Hopper died in 1894. Hannah D. Hopper, a second time a widow, survived until 1899, when she died, leaving a substantial estate, consisting, apart from the premises in question, of personal property amounting to about $50,000, with practically no debts. She left a will making legacies aggregating about $6,000, and then devised and bequeathed the residue of her estate to her nephew and three nieces in equal shares, who are deemed co-complainants, directing that the complainants Ward and Hopper, her executors, should sell all her property, with power to make deeds of the same. The premises in question are not specifically described in her will, although the proofs indicate that when her will was made, if she did not own, or claim to own, the premises in question, which was the residence which she had occupied continuously for over forty years after the death of her first husband, George E. Tiffin, then she owned no real estate at all to which the provisions of her will in relation to real estate could apply.

The complainants claim that Mrs. Hopper, if she did not have some other title by deed or devise from her first husband, George E. Tiffin, acquired a complete title by adverse posses-

sion against all who can now claim under him by descent or devise. The defendants insist that Mrs. Hopper occupied under her right of quarantine continuously during her lifetime, Abigail Tallman, the heir of George E. Tiffin, and the children and grandchildren of Abigail, after her death, refraining from asserting their rights and having dower set off in consideration of the poverty of the widow. As we have seen, it is unnecessary to consider this contention until it appears that the defendants, or some of them, have, *prima facie,* shown title by descent or otherwise from George E. Tiffin.

. I am unable to find in all this mass of testimony that the defendants have established *prima facie* the fundamental proposition which is necessary to maintain their case and to put the complainants upon their proof of title, viz., that Abigail Tallman took the premises, or any interest therein, by descent from George E. Tiffin as his heir-at-law.

I shall not undertake to discuss the voluminous testimony presented in this case bearing upon the genealogy of George E. Tiffin and Abigail Tallman and their probable or possible relationship to each other. A large part of the testimony on behalf of the defendants bearing on these subjects was taken in flagrant disregard of the rules of evidence. Leading questions were put where it was of the utmost importance that the witnesses should testify without suggestion of any kind as to the answer. Many witnesses apparently state facts in relation to matters which occurred long before they were born, and their testimony is given in such shape that it is often impossible to determine when their affirmations are based on hearsay and family reputation and when they are based upon their own inferences.

The defendants' case rests practically upon the proposition that Abigail Tallman and George E. Tiffin called each other cousin. There is no evidence explaining in what sense the word "cousin" was used, or whether in fact it indicated that the parties were related by blood in any way. Counsel for defendants endeavored to show that Abigail Tallman's father and George E. Tiffin's mother were brother and sister, but the proof to sustain that proposition entirely failed, and I think that the

probabilities from the testimony strongly favor the contradictory proposition.

In the year 1830 George E. Tiffin was in business in Richmond, Va. George D. Tallman, Jr., a youth about sixteen years of age, son of Abigail Tallman, was a clerk in Mr. Tiffin's employ. Some old letters from members of Mrs. Tallman's family to this young man, George D. Tallman, Jr., written at this period, were produced in evidence by the defendants. In one of them a message is sent from Mrs. Tallman, and I think from other members of her family, to "Cousin George." Assuming that the "Cousin George" referred to was George E. Tiffin, which counsel for the complainants disputes, it is a significant fact that in another letter, written at this same time by Oliver Hicks, the brother of Abigail Tallman, to this same young man in Richmond, the writer asks the young man to give his "kind respects to Mr. Tiffin." Such a message certainly is hardly to be expected under the circumstances from a man writing to his nephew and the message being sent to his own cousin.

The only other class of testimony in favor of the proposition that Abigail Tallman was the heir, or one of the heirs, of George E. Tiffin, to which I shall refer, consists of statements made by Hannah D. Hopper after, and probably long after, Mr. Tiffin's death.

In order to appreciate the probative force of these statements, it is necessary that the extraordinary history, or lack of history, of this man George E. Tiffin should be thoroughly understood. It is almost safe to say that the origin of George E. Tiffin is left by the testimony in this cause entirely shrouded in mystery. It was understood that his original name was Eaton—that he was taken into the family of a man of means named Tiffin, about whom, however, no further information is given. He adopted the name of his benefactor and appears to have received a fair education and to have engaged in business with some measure of success in Richmond, Va., and perhaps elsewhere. A Bible printed in 1784 is produced, which the testimony shows was given by Hannah Hopper to a granddaughter of Abigail Tallman as the Eaton family Bible, or a Bible which belonged

to her first husband, George E. Tiffin. The entries of births in this book are extremely peculiar. The handwriting was not satisfactorily proved. If the record proves anything of value in the case, it indicates that George Eaton Tiffin was born in 1794 and that probably his parents were Robert Eaton and Phoebe Eaton, and probably he had three sisters, whose names and dates of birth are given. If the unexplained record is of a family, the above would be the fair inference. Practically no trace of any of these persons beyond George E. Tiffin himself appears in the testimony.

In 1835 George E. Tiffin, when over forty years of age, married Hannah Drummond, who was then a mere child of fifteen. About the year 1840 Mr. Tiffin and his young wife settled in Eatontown, and soon after he purchased the property now in dispute and made it his home. He lived in Eatontown continuously until his death, in 1857. He is described as a man of good education and courtly manners. He was a judge of the court of common pleas of Monmouth county and appears to have been a man of somewhat conspicuous figure in his community, and yet no one to-day appears to know where he came from or who in fact he was.

But the fact to be observed in relation to this mysterious stranger is that there is no evidence that his wife, at the time of her marriage or at any time thereafter, ever acquired any more knowledge of her husband's origin and family connections than the other persons whose declarations have been proved on that subject. Abigail Tallman lived not very far away from Eatontown and visits were made between the Tallman and Tiffin families. These people, as we have seen, called each other cousin. Inferences of relationship from this fact undoubtedly were drawn during Mr. Tiffin's lifetime and after his death by the descendants of Abigail Tallman, and the same sort of inference may well have been drawn by Mrs. Tiffin during the lifetime of her first husband, during her widowhood and after her remarriage with John Hopper, in 1867.

The gift of the Eaton Bible by Mrs. Hopper to one of the granddaughters of Abigail Tallman for the purpose of having the book remain in Mr. Tiffin's family, or because of the pro-

priety of having it so remain, indicates that Mrs. Hopper, long after the death of Mr. Tiffin, shared the apparently common belief that he was some sort of a relative of Abigail Tallman. The statements which Mrs. Hopper made in various forms twenty, thirty or forty years after her first husband's death, to the effect that she had no title to the property which he occupied, and that the same belonged to the heirs of Mr. Tiffin, were manifestly true from her point of view. It is a most significant fact that when she made these statements she apparently did not say who the heirs of George E. Tiffin were, and the absence of such a statement in some instances suggests that she did not know who those heirs were. So, also, the statement that Mrs. Hopper made, probably years after the death of her first husband and her remarriage, that the Tallmans, referring apparently to the descendants of Abigail Tallman, were Mr. Tiffin's nearest relatives, was entirely natural, if Mrs. Hopper supposed, as others did, that these two persons who called each other cousin in fact were in some way related.

The utter inability of the witness for the defendants, Sarah M. Barclay, to give any information as to the family or relatives of Judge Tiffin, or to indicate how he was related, if at all, to his "cousin," Abigail Tallman, seems to bear strongly against the defendants' claim. Mrs. Barclay was a lifelong, intimate friend of Mrs. Hannah D. Hopper. She was the elder by two or three years. She knew Judge Tiffin, as well as his young wife, before their marriage, and she "lived in Eatontown for thirty years next door but one to Mrs. Hopper." And yet this witness, while testifying to statements made by Mrs. Hopper in regard to Judge Tiffin and the Tallmans, of the kind above referred to, utterly fails to throw any light on the question what the relationship between Judge Tiffin and the Tallmans was or how it arose. She does not even say that Judge Tiffin and Mrs. Abigail Tallman were reputed to be cousins, or called each other cousin, or that Mrs. Hannah D. Hopper said that they were cousins, or said directly that they were related in any way by blood. When asked if she knew "of any relationship" between Judge Tiffin and Mr. and Mrs. Tallman, the witness answered: "They were very intimate and visited each other

when they were at Shrewsbury." Mrs. Barclay also testified in regard to statements made by Mrs. Hopper containing admissions that the Tallmans had some interest in the Tiffin property. The substance of this testimony, so far as it is safe to accept it as purporting to give Mrs. Hopper's language, appears to be contained in the proposition that Mrs. Hopper "thought they [the Tallmans] had a claim on her property." If Mrs. Hopper thought the Tallmans were relations of Judge Tiffin, and knew of no nearer relations, she would naturally think that they could make some claim. All the statements of Mrs. Hopper in the nature of admissions which have been testified to in this case may, I think, be properly regarded, if proved, as nothing more than honest inferences which Mrs. Hopper drew from some supposed relationship between Judge Tiffin and Abigail Tallman, the nature or degree of which she did not pretend to know —a relationship inferred by Mrs. Hopper, as well as other persons, from the use of the word "cousin."

Without discussing further the testimony upon this subject, I think that all the evidence to sustain the claim that Abigail Tallman was a blood relative of George E. Tiffin rests upon proof of the fact that these two persons called each other cousin, together with the inferences drawn from that fact and stated by a number of very much younger persons, practically all of another generation, and some of them of a third generation, from Mr. Tiffin and Mrs. Tallman, who had no knowledge in regard to the matter whatever. An estate cannot be taken from one person who is in the peaceable possession of it and given to another on the strength of such evidence. Judge Tiffin and Mrs. Tallman, who appear to have been old friends, their acquaintanceship dating back to a time prior to Judge Tiffin's marriage, may have called each other cousin for a large number of reasons other than the existence of a tie of blood. As we have seen, it does not appear through which of the parents of Judge Tiffin or Mrs. Tallman the cousinship was traced, nor does it appear, if these two persons were cousins, whether they were first cousins or fifth cousins, or tenth cousins, or what the degree of relationship as cousins was. They may have been

cousins by marriage or cousins by courtesy, or cousins by blood, but of a kind who can never inherit from each other.

The answering defendants, in seeking to maintain the fundamental proposition to support their claim of title, are certainly confronted by a strong presumption against them arising from the conduct of their parents and their grandparent, Abigail Tallman, through whom their title is claimed. As we have seen, Hannah D. Hopper, the widow of George E. Tiffin, remained in exclusive possession of the family mansion, the premises in question, from the death of her first husband, Judge Tiffin, in 1857, until her death, in 1899, a period of forty-two years. Abigail Tallman and her children and grandchildren appear to have submitted to this exclusive possession and the proofs utterly fail to show that Mrs. Hopper was allowed to occupy in the continuous enjoyment of her right of quarantine by the favor of the Tallmans and in consideration of her poverty. Abigail Tallman died only five years after the death of Judge Tiffin, leaving children and grandchildren. Nine years after Judge Tiffin's death his still youthful widow married a man who is shown to have had some means and apparently was abundantly able to support his wife. After this remarriage the second generation of Tallmans made no move to assert their alleged claim. As the years went by Mrs. Hopper received from her own family, from time to time, amounts of property which in the end aggregated a substantial fortune, apparently a large fortune as compared with the means of some of the Tallman family. And yet this comparatively rich dowress, after her remarriage, remained in exclusive possession of Judge Tiffin's property, while his heirs, all of whom certainly were not rich people, submitted to this deprivation of their estate.

There is another most significant circumstance proved in this case which indicates that after the death of Judge Tiffin, in 1857, Abigail Tallman had no proof that she was his heir or next of kin, and that after her death her children and grandchildren had no such proof. It appears that Judge Tiffin's widow and one Edward H. Van Nuxson were appointed administrators of the Tiffin estate. These administrators filed their final account showing a balance remaining in their hands of

21

$2,193.23 "to be disposed of as the law directs." The records
of the court show no order for distribution, no release or any
paper indicating what was done with the above balance. It is
admitted, however, by the parties to this suit, that Mrs. Hopper,
then Mrs. Tiffin, appropriated this entire balance, and it does
not appear that she did it either by leave of the Tallmans or
against the protest of the Tallmans. The whole proceeding
strongly suggests the appropriation of property for which no
claim could be maintained other than by the public authorities,
who oftentimes are not called in and reminded that they can
make a claim on behalf of the state or the poor of the township.
If Abigail Tallman, as the defendants insist, consented, in view of
the widow's poverty, that she should appropriate the half of this
money, which belonged in whole or in part to her (Abigail), is it
reasonable to suppose that the administrators would have been al-
lowed and would have allowed themselves to be placed in the posi-
tion, practically, of embezzlers? Would not the natural way of
doing the business among such intelligent people have been to
have an order of distribution made giving the widow her half of
this balance and awarding the other half to Mrs. Tallman as next
of kin, if, in fact, there was even presumptive proof at that time
obtainable that she was such next of kin? A release or transfer
executed by Mrs. Tallman would then protect the administrators
and protect the widow. If the supposition can be made that
Abigail Tallman consented to allow Mrs. Tiffin to appropriate a
thousand dollars, to which, or in which, she, Mrs. Tallman, had
a claim, while no protective writing or record of any kind was
made, it hardly seems probable that after Abigail Tallman had
died, and after her children died, and after this widow, who had
received such kindness and generosity, had remarried and become
rich in her own right, no descendant of Abigail Tallman would
have come forward to ask, as a matter of justice, that this rich
woman, a second time a widow, should now at last surrender the
Tallman inheritance or make compensation therefor in some
other way.

After these years of delay—after this unexplained or insuffi-
ciently explained acquiescence and laches on the part of Abigail
Tallman, and more particularly on the part of her children and

grandchildren—the claim of these defendants, in my judgment, rests under a cloud and calls for more distinct proof than would be necessary in the absence of this unreasonable delay. The just inference in such cases often is that the claim has not been preferred, when the evidence in regard to it must have been more accessible, because, if it had, the evidence would not have sustained it. It seems to me that this is the sort of a case to which the principle above referred to can most equitably be applied. When one with full knowledge of his rights allows forty years to elapse, during which he makes no claim, he may well be held under obligation to clearly explain and excuse his delay, or, in the absence of such explanation and excuse, to clearly and distinctly prove his claim. Doubts should be solved against him.

I fail to find any sufficient evidence presented in this case to justify a decree establishing in favor of any of these answering defendants any estate, interest or right in the land now in the peaceable possession of the complainants. Whether the complainants so in possession have a title by adverse possession or otherwise are matters, therefore, which need not be considered in this case.

A decree will be advised for complainants, with costs.